We will hear argument next in case number 65 on our original docket, state of Texas versus the state of New Mexico. General Hawkins? Thank you, Mr. Chief Justice, and may it please the court. The River Master's decision to award evaporative loss delivery credits to New Mexico effectively deprives the farmers and businesses of West Texas of a year's worth of irrigation and threatens incalculable economic harm should New Mexico redeem those credits during a drought year. That result is unlawful substantively under the Pecos River Compact and procedurally under this court's 1988 amended decree. New Mexico and the River Master have offered only two theories justifying these delivery credits, but each violates the plain text of the compact that Congress approved. New Mexico's lead argument is Article 12, but as the United States correctly points out, Article 12 cannot and does not justify the River Master's decision. It applies only to consumptive use of water by the United States and there was no use here at all. The United States merely re-regulated the water for public safety purposes and released it not when it could be The only other substantive provision New Mexico and the River Master have pointed to is C-5 of the River Master Manual, but C-5 applies only in two situations and neither one is presented here. The first is under Article 6D when dealing with unappropriated floodwaters, but here the River Master determined that these waters are not unappropriated floodwaters and the parties haven't challenged that, so Article 6D doesn't apply. The second is under Article 12, which as I mentioned a moment ago is not implicated here where there's no use at all. The compact sets the rules and the manual simply turns those rules into math. Here the compact prohibits charging Texas for these evaporative losses that occurred in New Mexico and nothing in the manual can supersede that. Counselor, before you go any further, I want to clear away some underbrush here. You spend an awful lot of time in your brief talking about forfeiture and waiver and estoppel. You haven't mentioned that here and you don't really think we would decide a case of this importance between two states on the basis of those doctrines, do you? Well, Mr. Chief Justice, I think there's two ways to decide this case. One is on the substance and the other is on procedure, and indeed I think there would be a good reason, Mr. Chief Justice, to refuse to entertain what the River Master did here on procedural grounds. This court's 1988 amended decree specified specific time periods and deadlines for a reason. It's partly to manage this court's own docket, but it's also, I think, an acknowledgement that the farmers and businesses in West Texas rely on predictability and some level of certainty. This water is central to their livelihoods and to be in a position where we're arguing about emails and waiver that happened six years ago, I think is a disservice to the real world impact that this has, which I think is what the court was acknowledging in 1988. You say that the water at issue here can't be considered stored in the Brantley Reservoir for Texas, right? That's correct, Mr. Chief Justice. But Commissioner Tate on page 61A of your appendix specifically asked that New Mexico store Texas's portion of the flows until such time as they can be utilized by Texas. And the email was, in fact, titled Texas Request for Storage. What do you do with that? Mr. Chief Justice, that email is talking about storing Texas's portion of unappropriated flood waters, and you don't have to take my word for it. New Mexico's response, Your Honor, at 63A confirms that New Mexico understood this to be a communication about unappropriated flood waters. New Mexico is not in charge of Brantley, and indeed for two months before that email at 61A, the Bureau had already been re-regulating the water as page 66A confirms. And that email is simply reflecting a mutual mistake between the parties that these were unappropriated flood waters. And I think it's crucial to note that, Mr. Chief Justice, if that email at 61A had never been sent, nothing would have been different. Well, you draw a sharp distinction between holding the water for storage and holding it for flood control. Can't they be doing both? Well, two things, Your Honor. Number one, they say that they weren't doing both. The United States says they were only re-regulating the water for flood control. And I think the reason they say they weren't storing the water for use is twofold. Number one, to do that, they would need a Warren Act contract with Texas, and there is no such contract. And number two, I think the fact that the United States released this water in August of 2015 when the public emergency expired, and without any regard at all to whether any state could use the water, confirms that it was not being Mr. Chief Justice, I don't think it's a matter of fault. Texas and the Bureau have chosen not to enter into one. And of course, entering into a Warren Act contract is not as simple as buying a new car. It takes months or years because those contracts are subject to NEPA and environmental laws. I'm a little bit confused by your argument because on page 270 of the appendix to the motion for review, it seems as though the river master is deciding that, well, Texas was unable to take the amount of water that it would have been able to take under the 1947 conditions. And as a result of that, the water has to be held. And so it basically said, well, we will say that this is Texas's water. I don't understand you to agree with that. Could you tell me exactly why this assessment by the river master is wrong? Sure, Justice Thomas. I think it all starts with the compact, which has the status of federal law. The compact at article 6C says that the inflow outflow method should be used to determine New Mexico's delivery obligation. Now that just means that New Mexico gets credit for water that crosses the state line and doesn't get credit for water that does not cross the state line. Now here we're talking about water that didn't cross the state line. It evaporated in New Mexico. And so the question is, what in the compact allowed the river master to deviate from the inflow outflow rule in 6C? And New Mexico and the United States and the river master have not pointed to any exception in the compact that allows deviating from this rule. And indeed at page 278 of the record, as your honor just pointed out, the river master effectively admits that. This is towards the bottom of the page. He admits that if these waters are not unappropriated floodwaters, then we're just going to use the regular inflow outflow method. And that gives away the game because the inflow outflow method does not allow the credit for these evaporative losses. I understand your argument there, but his point is that the reason that that happened is because you couldn't take it. That the Red Bluff Reservoir was in disrepair and could not accept the volumes that it could have accepted in 1947. Justice Thomas, that's not correct because Texas began releasing water from the Red Bluff Reservoir in March of 2015 to make room for these anticipated inflows from the Brantley Reservoir. In February of 2015, the United States, or rather in January, and this is a page 137A, the river or the United States indicated that it was going to begin releasing waters. In response to that, Texas started clearing out room in the Red Bluff Reservoir, but New Mexico objected to the release of the water at that time because of the ongoing disaster in Eddy County in southeastern New Mexico. That's why the Bureau held off until August. And we see that confirmed at pages 236, 137, and 68 of the Texas appendix. So your submission is you could have taken the water and it did not cross state lines. It seems they're suggesting you couldn't take it. So that's why they held for you. Justice Thomas, we began releasing 30,000 acre feet of water from the Red Bluff Reservoir in March of 2015. And yet the water did not come in from Brantley because the United States was still impounding it because of the disaster in New Mexico. And that's why you could have taken it. Yes, Justice Thomas, if the Bureau had began releasing water in March of 2015, we had cleared out room in the Red Bluff Reservoir to accept that water. Justice Breyer? Well, I start where Justice Thomas left off. It's very technical stuff here, but as I understood it, and correct me if I'm wrong, there's some water that belongs to Texas. It hasn't got to Texas yet. And for whatever reason, I thought probably because Texas asked, New Mexico stores it in a reservoir. And then some of that evaporates. So the question is, is Texas given a debit for the amount that did it belong to Texas, the evaporated water, which you can't get because it's in the sky. And the river master says yes. That seems to make sense. That's why we appoint river masters to figure those things out. You say, oh, no, nothing in the contract, nothing in the basic document here, the agreement, compact, nothing allows that. Well, the SG says, go read how they did it. They did it according to the report of the Engineering Advisory Committee. And that's how they decided that evaporation question. That seems right. And then he pointed to 6C, which says, unless there's a more feasible method, you ought to use the report of the Engineering Advisory Committee. And that's what he used. So I understood this very simply. The water's gone. It evaporated. They go to the Advisory Committee's report. They use that and say, the evaporated water is Texas's. And they look at, say, 6C and say, well, the master has the all this means. So what's your response? So Justice Breyer, I agree with your honor that this is straightforward, but I disagree with your conclusion. The starting point is that if the water doesn't get to Texas, then New Mexico doesn't get credited for it unless there's some exception that specifically provides for it. So the question then is, what exception would be implicated here? Well, we're talking about reservoir losses, water that evaporated. There are only three parts in the compact that speak to reservoir losses. One is 6D3. That can't be implicated here, though, because these are not unappropriated floodwaters, which is all that 6D3 is talking about. The second is Article 12, and that's not implicated here for the reasons that the United States has correctly set out. The other is Section 5D10, which only says that when you're dealing with reservoir losses, look to Article 6 to figure out what to do with them. So we're missing something in the compact allowing this deviation from the standard inflow-outflow method. And the core mistake that the United States makes, the United States gets many things right. They're correct about Article 12. They're correct that everything in the manual has to be tied back to the compact. But they're tying C5 to the wrong thing. C5 only applies in the situations that I've set out, and those situations aren't implicated here, so we can never get to C5 in the first place. Thank you. Thank you. Justice Alito, counsel, could you begin by explaining very briefly what, as a practical matter, is at stake here? What would happen if you win as opposed to what would happen if you lose? Well, a couple of things, Justice Alito. Number one, if we were to win, we would, of course, wipe away the delivery credit that New Mexico has been awarded, and that's an extraordinary amount of water. It's a year's worth of irrigation that New Mexico would otherwise be entitled to sit on as a credit and cash in, potentially, during a drought year. But I think the broader implication, Justice Alito, is that I think to rule for Texas here would underscore what this court said in 1983, that only the compact controls, and it doesn't matter... My question went to the practical effect as to water. So your answer is that for some period of time, New Mexico would, at some point in the future, New Mexico would be entitled to refuse to deliver water that you would otherwise be entitled to and have a need for. Is that right? Yes, Justice Alito. Okay. I find this a very difficult case because it seems to me that everybody, both Texas and New Mexico, has a right to refuse to deliver water. The decisions were made by a variety of officials and employees on behalf of the states. But to begin, it wasn't clear to me who is entitled on both sides to make commitments that are binding on the two states. Only the state commissioners, Justice Alito. Only the state commissioners. Correct, Your Honor. Okay. As to Article 12, is it your position this is not unappropriated flood water? The river master... Yes, Justice. The river master determined that this is not unappropriated flood water, and nobody has challenged that determination. Now, if the river master had determined that it was unappropriated flood water, then we'd still win because unappropriated flood waters must be a portion 50-50 between the states, which, of course, the river master didn't do here. Do you agree with the river master that if this water had been released instead of being stored or impounded or re-regulated or whatever was done to it, you could have stored the water had you not allowed the storage capacity of your reservoir to be deleted below what existed under the 1947 condition? Well, no, Justice Alito. We don't agree with that conclusion. We were preparing room in the Red Bluff Reservoir to accept this water. But at the end of the day, Justice Alito, the river master's findings on that don't actually matter. Your honor mentioned that this is a difficult, complicated case with a long record. I can try to make it easy for your honor just by pointing out that the river master has awarded a delivery credit that the compact doesn't allow for. And if the court reaches that conclusion, and to reach that conclusion, the court only has to look at the compact in the manual, everything else drops away. All of these communications, all of these emails, these arguments about waiver and forfeiture, they all go by the wayside if this court holds that as a substantive matter, the compact does not allow for what the river master did. Thank you. Justice Sotomayor. Counsel, is there an email of any kind or something in writing where Texas at any point is rescinding Commissioner Tate's email saying, store the water for us. Is there anything in writing by Texas saying, release it and release it faster than you are? Well, your honor, that email doesn't exist because New Mexico doesn't control Brantley. The bureau controls Brantley. And so presenting a request like that to New Mexico would be like me asking Mr. Wexler if I can borrow Ms. Hansford's car. So that's the whole point, which is so why did Mr. Commissioner Tate send that email to Texas asking him to hold the water? Clearly it seems to me that the assumption of holding the water was that the bureau would act on behalf of Texas. And the bureau confirmed at 236 and 137 and 68 that it was concerned about flooding in New Mexico and that's why it was re-regulating the water. And indeed, New Mexico acknowledges that there were flooding concerns in Eddy County and that was the source of the bureau's action. This email that your honor refers to at 61A is simply a discussion between the parties about how to account for unappropriated floodwaters. But two years later, when the river master determines that these are not unappropriated floodwaters, all of these emails drop away and become irrelevant. But is there anywhere that you've told the bureau, release it faster? Well, your honor, in March... You should have sent it to New Mexico, but why didn't you say it to the government? Well, your honor, we were in regular communications with the federal government and we see some of these communications in the record reflected in the government's emails like the one at 68A and 236 that reflects the concern is in New Mexico, not in Texas. Assuming we were interested in the Article 12 issue, is there anything in the compact or in any of the amendments to it that would preclude the court from relying on Article 12 when the river master didn't? Well, the court, of course, can apply federal law, your honor, which is what this compact is. The reason not to rely on Article 12 is because by its plain terms, it doesn't apply. There's no consumptive use of water by the United States. And later on in Article 12, it speaks to water in one state for use in the other state. That can't be a hook to bring that provision into this case because the water at issue was not stored for use in Texas. It was re-regulated for flood control. And the best evidence of that, Justice Sotomayor, is that the federal government didn't care whether the water could be used when it released the water from Brantley beginning in August of 2015. It released it without regard to use. And that only confirms what they were saying, that they were re-regulating it not for use, but for flood control. Thank you, counsel. Justice Kagan? General Hawkins, if I could take you back to the procedural aspects of this case. Your brief makes it sound as though New Mexico blindsided you with its motion to account for the evaporation losses. But the way I read the record, really everyone agreed that the issue would be postponed while the parties negotiated. And then throughout negotiations, everyone agreed that Rivermaster was, in the end, going to make a one-time adjustment. So everybody agreed to this process. And then, you know, if you look at the record that way, it's you lost. And all of a sudden, you think the process isn't any good because you came out on the short side of the process. But, you know, isn't this a process that you agreed to and went forward with for years? No, Justice Kagan. I think that the record tells a very different story. We know that the federal government began re-regulating this water as it was falling in September of 2014. From that moment on, the parties start talking about this unprecedented event as though it's unappropriated floodwaters. And for two years, the communications going back and forth are about how to account for unappropriated floodwater. And that's confirmed at 97A of the Texas Appendix and New Mexico Appendix, page 139. We see that that's what the parties have in mind. It is Texas who was blindsided two years after the rain by New Mexico changing its position, indeed reversing its position, and saying, well, no, wait, these are not unappropriated floodwaters. We actually think that they should be not split 50-50, as unappropriated floodwaters would be, but rather we think they should be charged entirely to Texas. And that's when they made their unilateral motion at page 44A of our appendix. And that's when we formally objected, saying that the compact in the decree does not allow for this. And when you say that all the emails are irrelevant to the determination of a substantive question, I take it that that's because you're saying that the emails are only about unappropriated floodwater. Is that correct? So it's the same kind of argument? Yeah, I think that's basically right, Justice Kagan. Really, the substantive argument doesn't depend on emails, because the substantive argument depends only on the text of the compact and the manual. And without looking to anything else, we can tell from those documents that what the Rivermaster did is forbidden. Well, the text of the manual is the text of C-5, at least in part, right? So the question is, why wasn't the Rivermaster right? And again, this is under a clear error standard under C-5, given the text of those emails. Sure, so Justice Kagan, I think 15A of the Texas appendix helps answer the question. That's chapter A of the Rivermaster manual. And we see at A-1 of the Rivermaster manual, an instruction to use the inflow-outflow method, which is tied back to Article 6C. And there's a lengthy equation for how to do that. Then at A-2 in the manual, the manual acknowledges that there are, and this is a quote, there are factors which, under terms of the Pecos River compact, might at times increase or decrease that obligation. So we start with inflow-outflow, and then we look whether there's an exception. And under 2A through F are the six enumerated exceptions that can all be traced back to the compact itself. And so in order to invoke C-5, Your Honor, it has to be traced back to an enumerated exception in the compact itself. And that's what's missing here. The only provisions in the compact that speak to reservoir losses like this are in 6D-3 and Article 12, and neither one of those is applicable here. And that means that we're missing an exception. We're missing a departure. And so we have to revert to the core rule of this compact, which is inflow-outflow. Thank you, Counsel. Justice Gorsuch? Counsel, let me pick up where Justice Kagan left off, first of all. You indicate that in order to trigger C-5 of the manual, which speaks about the allocation of evaporative losses, we need first to have something in Article 6 or Article 12 that might allow that application of the manual. But why can't Article 3, which indicates who gets what based on 1947 levels, why couldn't the master have reasonably thought that the manual applies in those circumstances too? Because, Justice Gorsuch, Article 3 doesn't say anything about what happened here. Here, we've got water... Counsel, what it does say is that Texas gets what it had in 1947. And one way to calculate that might be using the manual and its particular, more specific direction with respect to evaporative losses. So, Article 3, Justice Gorsuch, doesn't speak to evaporative losses. The core rule... I understand that, Counsel, but I'd be grateful if you kind of got at my question rather than going back to 6 or 12. Why couldn't the master have thought that in calculating what Texas had in 1947, evaporative losses needed to be considered, and the manual was a reasonable way to do it? Well, Justice Gorsuch, the inflow-outflow method has always been the way of calculating the 1947 condition. That's what this court said in the 1983 decision in this case. This court said that we cannot come up with new methods beyond... All right, Counsel, I got it. Separate question. On the back and forth questions about procedure here, you suggest that even if... that we shouldn't consider New Mexico's arguments because it was just too late and the master acted after the deadline. But it's not clear to me why, even if you're correct about all that, any of that is jurisdictional. Can you address that question? Sure, Justice Gorsuch. We think that this court's amended degree is analogous to something like FRAP 4, which imposes a jurisdictional notice of appeal deadline. We think that this is similar. We've got a federal statute called the Pecos River Compact, and this court is interpreting it in the amended decree and interpreting it to include certain deadlines for the administration of the compact. And so we think it's fair to say it's jurisdictional. But the court doesn't have to hold that to rule in my favor. Even if this is not jurisdictional, New Mexico is not entitled to equitable tolling because they haven't provided a reason why they would be entitled to equitable. Thank you, Counsel. Justice Kavanaugh. Thank you, Chief Justice, and good morning, General Hawkins. The... It's been argued that the appropriate standard of review of the River Master is clear error, a deferential standard. Can you respond to that? We agree, Justice Kavanaugh, that that's the standard. That's what this court said in the amended decree, and we easily satisfy that here because the River Master has violated federal law, and it is always clear error to violate the law. Okay, on the federal law point, I think your primary submission seems to be that it's not rooted in the compact, what happened here. But I just want you to respond to the idea that Article 6C of the compact and Article 3A refer to the inflow-outflow method. Then the amended decree points out that you should look to the manual, and the manual, in turn, talks about factors that may increase or decrease New Mexico's obligation. And C-5 then seems to refer to precisely this kind of situation where there have been losses attributable to its storage in New Mexico. So which parts of that you may take issue with several parts of that chain of reasoning. How about it? Justice Kavanaugh, I agree with everything you said, except for the last part, tying C-5 into this dispute. I agree that we have to start with the compact itself. The compact says use inflow-outflow unless there's a departure. Now we go to the River Master manual, and we see, and this is page 15A of the Texas appendix, we see A-1 saying this is the equation for calculating inflow-outflow. And then at A-2, it says that there are these departures under the terms of the Pecos River Compact. And what that means, Justice Kavanaugh, is that to invoke one of these departures, we have to be able to tie it back to the compact. And I think, Justice Kavanaugh, an analogy might be helpful regarding the Delaware River. C-6 of the River Master manual gives the math for dealing with the Delaware River. That's cross-referenced in A-2F. And we see that tied clearly back to the compact itself in Article 3B, which describes the Delaware River water as one of these departures from inflow-outflow. The same thing goes for C-5. We're talking about reservoir losses, which are spoken to in two places in the compact, and neither one's applicable here. And so we can't ever get to C-5. And indeed, Justice Kavanaugh, even if you're not with me on that, C-5 on its face does not apply. It's talking about the Texas allocation, but it doesn't tell us what that is. It's talking about water stored. This water wasn't stored. It was re-regulated. This water wasn't, and of course, none of that was at the request of Texas. Indeed, it was New Mexico that initially wanted this water re-regulated. So even on its face, C-5 isn't applicable, but it cannot be tied back to an exception in the compact that would allow the deviation from inflow-outflow that the river master performed. Thank you. General Hawkins, why don't you take a minute for wrapping up? Thank you, Mr. Chief Justice. I just want to emphasize that this case presents to the court a narrow, pure question of law. That question is whether the compact that Congress approved allows for the awarding of evaporative loss credits. Now, my friends on the other side have failed in their briefing to point to anything in the compact that allows this. We've got this general rule, inflow-outflow, and that prohibits awarding credits for water that doesn't cross the state line unless there's an exception in the compact. And that's the end of this case because there is no exception in the compact, and it's always clear error to violate federal law as the river master did here. Setting all that aside, if this court wants to look to the equities, New Mexico has the equities all wrong. New Mexico is asking this court to give it something for nothing. It wants credit for water that it never delivered to Texas that neither state could have used, and that would have caused environmental catastrophe in New Mexico had it been released by the federal government. On the other side of that ledger is the fact that Texas began releasing water from Red Bluff, wasted and unused, in March of 2015 to make room for the anticipated releases from Brantley. But because of what was happening in New Mexico, the federal government kept that water re-regulated until August of 2015 to allow any county in New Mexico to recover. Between March and August of 2015, Texas released over 30,000 acre-feet from Red Bluff to make room for the Brantley inflow, and that water never came because of what was happening in New Mexico until the fall. Under these circumstances, it would be extraordinarily inequitable to deprive the farmers and businesses of West Texas of a year's worth of irrigation water. Thank you, Your Honor. Mr. Wexler. Mr. Chief Justice, and may it please your court. In this case, the court must determine whether Texas should be charged for evaporation of water that was stored in New Mexico at Texas's request and for Texas's benefit. The Rivermaster appointed by this court determined that New Mexico was entitled to a one-time credit. The court should reject Texas's motion challenging the Rivermaster's determination for two reasons. First, Texas should be responsible for evaporation loss from water stored at its request. The Rivermaster found that, but for Texas's request, New Mexico would have released all water above its storage limit, and that water would have flowed across the state line into Texas. That funding is supported by the essence and is not solely their business. It is fair to charge Texas for the evaporation because if the water had not evaporated, it would have done it for the satisfaction of New Mexico's Article III obligation under the Texas River Contract. The Rivermaster used existing accounting procedures required by the court's decision previously, and specific to Paragraph 35 of the Rivermaster Manual, to credit New Mexico for the evaporation and put New Mexico back in the position it would have been but for Texas's request. Second, Texas argued that the accounting adjustment was untimely, but New Mexico was justified in relying on the procedures adopted by the Rivermaster for resolving the novel and complex accounting issues. As the Rivermaster found, the states knew from the time of the storm that a one-time credit would be retroactively applied in favor of New Mexico. With concurrence from the states, the Rivermaster notified the court of the unresolved accounting and established a procedure for deciding the issue. Neither state objected, and New Mexico was entitled to rely on the Rivermaster's procedure. Although the states were in regular contact on the issue, Texas did not question the timeliness of the Rivermaster's procedure until three and one-half years after the water had been stored. The court should deny Texas's motion. Counsel, your friend on the other side says that the water could not have been stored at Brantley for Texas in the absence of a Warren Act contract. I'd like your answer to that. Yes, Your Honor. At page 68 of the Texas Appendix, you can see an email from Reclamation in which they're indicating to Texas two things. Number one, that the Water Reclamation understood that at that point in July of 2015, the water was being stored for Texas. And second, Reclamation could no longer store the water on Texas's behalf unless Texas began to negotiate a Warren Act contract. We understood and understand that Texas always had the option of beginning to negotiate that contract,  You emphasized throughout your brief the clearly erroneous standard for reviewing the Rivermaster's determinations. And it looks to me like we did say that in the 1988 decree. Is that right? It is, Your Honor. But I thought in an original action that we don't review findings under a clearly erroneous standard because the Rivermaster is not in the position of a district court, but is acting in our stead. And I certainly think there are cases that say that. How do you reconcile that? You're correct, Your Honor. In an original jurisdiction case, ultimately the court is responsible for all determinations. In this case, the liability has already been determined as between the two states. The court entered its amended decree and it assigned the Rivermaster the duties of administering that decree. And so we're not looking at liability in the first instance. I would also say that there is agreement amongst the states that clearly erroneous standard was applied. If you review the record, in fact, the states proposed the decree in the current form. And finally, we understand that the rationale for adopting the clearly erroneous standard was in part to ensure that a series of original actions were not elevated to the court to be decided. Thank you, counsel. Justice Thomas? Justice Thomas? Thank you, Mr. Chief Justice. Counsel, the state of Texas argues that if it doesn't, basically, if it doesn't cross state line, it can't be counted. And on page 270 of the joint appendix, the Rivermaster suggests, well, it couldn't cross state line because Texas was not prepared to receive it. That's a suggestion. I'm not going to read all of the provisions. How do you react to that? Texas says we could have taken it and it didn't come across, therefore, it can't be counted. Well, two things, Justice Thomas. The first is the inflow-outflow method determines the obligation of New Mexico based on the amount of water that falls within New Mexico. And so here, the flows from Tropical Storm Odile formed part of the water that New Mexico was obligated to deliver to Texas. And the record is very clear that but for Texas's request, New Mexico would have delivered that water to the state line. And the way in which Texas sees that provision, it would completely read out and make meaning with the provision of paragraph C5, and for that matter, Article 12 of the Compact, in that those provisions only make sense to the extent that part of the allocation of Texas can be stored in New Mexico. As to your question as to whether or not the water could have been stored in Texas, I think the Rivermaster's finding on the 1947 is quite clear. And that is the amount of water that each state is entitled to is defined by the 1947 condition and the existing facilities in 1947. And because Texas allowed Red Bluff Reservoir to go into disrepair, it no longer had the ability to store the water. But in 1947, which is what the Compact keys do, it would have been able to store that water. Thank you, counsel. Justice Breyer? No, you may go ahead to the next. Go ahead. I'm not, I don't have a question. Justice Alito? Counsel, would you agree that so long as the water was being re-regulated or held or whatever the term is in the Brantley Reservoir, by the Bureau of Land Reclamation for flood control purposes, then any evaporation should not be charged against Texas? No, we would not agree to that, Justice Alito. The authority under which reclamation stores water is not the same question as to whether the water is stored for Texas' benefit and it should be charged with the evaporation. Rather, paragraph C-5 used by the river master keys to whether there is a request from Texas. Here, there's no dispute that one of the reasons that there was a significant amount of water had to do with the tropical storm, which created flooding issues. Well, I don't understand that, counsel. I don't understand that answer. If reclamation is holding the water for flood control purposes, then how can the water be stored at Texas' request? It can't be both, can it? It's either being held for flood control purposes or it's being stored at Texas' request. No, I don't think that that's right, Your Honor. The authority under which reclamation was operating was the flood control authority. Its authority to do so is relatively broad. I think that the record makes clear that, and the river master found, that in March of 2015, March 1st, reclamation would have released that water, but for Texas' request. It continued to hold that water under its flood control authority, but that has no bearing on whether or not the paragraph C-5 applies. And so what the court should be looking at is what is the reason that ultimately that water was stored. And again, there's no dispute Texas made the request, and there's no dispute that, at least from New Mexico's perspective, that water would have been delivered to the state line, but for that request. Well, I'm still puzzled by your answer, but I guess my time has expired. You can take some of Justice Breyer's time, Justice Alito. All right, let me move on to a different point then. The decree provides dates by which certain things have to be done. A final report has to be filed by July 1st. Does the river master have the authority by amending the manual to say, well, I really don't have to file a final report by July 1st. I can file some other type of report and then make changes to it retroactively. Well, Your Honor, the one-time credit that was made to the previous year's accounting was not made by virtue of an amendment to the river master manual. The change to the river master manual at C-7 was only a prospective change to provide guidance. And I think what happens here- Yeah, prospectively, does the river master have that authority? Certainly not, Justice Alito. The master does not have the authority to change the amended decree. And we don't think that that's what happened here. Here, he did submit a final report. If you look to the 2015 final report, in particular at page 61A, there he identified the procedure that the states had agreed upon, the procedure to resolve what had been determined was an unresolved issue. And that procedure said either the states would resolve that by agreement or absent that, one of the states could file a motion. Thank you, counsel. Thank you, counsel. Justice Sotomayor? Counsel, I'm a bit confused by what the special master did. And frankly, the fact that you haven't objected. If you were holding the water for Texas, he made you pay or took away from you half of the credits for the evaporation from September through March. First of all, I don't know how you could have been holding that water for Texas in September and October when they didn't ask you to. But if they asked you to, why aren't you entitled to the full evaporation credits? I think, Justice Sotomayor, that a strict reading of the river master manual, you are correct that prior to November 20th, when Texas requested the water, New Mexico would be charged for the evaporation under the normal operation of the inflow-outflow method. After November 20th, all of those evaporative losses would go to Texas. In this particular case, New Mexico did not challenge the split from November until March, in part out of a spirit of cooperation and comedy. All right, so let me stop you there. What would entitle him to have given, you're saying a spirit of cooperation, but if the water was being held both for your benefit and for Texas' benefit, which is how I read his order, what does that mean under the normal terms of the compact? If you couldn't release the water, shouldn't you be paying for the evaporation? Well, I think that is exactly right. Prior to November 20th, New Mexico would be charged with all of the evaporation. And then if you look to paragraph C-5, once the request was made, and I think that that's when the water would have been released, you can see that at 234A as well as 62 and 63A, then after November, all of that water should have been charged in Texas. Here, what the master said was, during that public safety period, both parties benefited and therefore, he split the evaporative losses. You could make a reasonable argument that that was allowed by the river master manual in that because Texas benefits, it was for its use pursuant to article 12 or paragraph C-5. And then certainly New Mexico would normally be charged for that water, which we think is fair because normally water stored in Brantley is used for the benefit of New Mexico residents and embodied in the compact is the principle that whichever party benefits from the storage should be charged with the evaporation. Thank you, counsel. Justice Kagan? Mr. Wexler, when you were talking to Justice Alito, you referred to this, the reclamation email to the states where the Bureau says, we expect to start releasing this water on March 1st. And you said it would have been released but for Texas's request. Now, how about if I read the record differently? How about if I read the record as showing that at that point, what was holding up the release was New Mexico's concern about flooding. If that were the case, then you wouldn't have a leg to stand on, would you? No, that would be a different case, Justice Kagan. But the record does not support Texas's assertion for a number of reasons. First, New Mexico never requested that the water be stored and never expressed any concerns about the water being released or being held for safety reasons. Quite the contrary, New Mexico made clear that but for the request from Texas, it would have released that water to the state line. Now, Texas sites emails at page 137 and 135, but those emails from a New Mexico entity, not the state, raised issues about not whether the water should be released, but the rate at which it should be released. And specifically their concern was that the water be released at a rate below 1200 cubic feet per second to protect the bridges. Now, you can see the reclamation considered that issue and said that, well, we're gonna release the water at a rate that's consistent with that. And you can see at page 236 that when the water was released in August, in fact, reclamation did release it at that rate. And so there was no reason related to New Mexico that the water was stored after March 1st. So why was the water stored? Well, you can see that Texas admits that the water is stored for their benefit at both pages ADA of the Texas appendix and page 108 of the New Mexico appendix, which is a letter from 2017 and a position paper to the river master in which they acknowledge, yes, this water was stored after March for our benefit and based on our request. And you can see at page 68 of the Texas appendix that reclamation agreed. It was holding that water for Texas and indicated, as I said earlier, if Texas had started to negotiate a war-enacted contract, that water would have continued to be held. So that's why the river master rejected Texas' position. And we also think it's noteworthy that even though the states had been in regular contact for three and a half years after the flood working through this issue, Texas never raised this position until May of 2018. As I said, three and a half years after the flood. Thank you, Counsel. Justice Gorsuch. I have no questions. Thank you, Chief. Justice Kavanaugh. Thank you, Mr. Chief Justice. And good morning, Mr. Wexler. First, a contextual issue about the real-world impacts of this dispute. General Hawkins said that ruling for you would threaten the farmers and ranchers of West Texas. And I guess I have two questions off that comment. First, do you acknowledge that? And second, if you do acknowledge that, what ruling against you or how would ruling against you likewise harm the people of New Mexico? If you could just zero in on the real-world impacts of this dispute. Well, I certainly agree with General Hawkins that this is a significant amount of water in a very dry part of the country. And yes, whichever state is unsuccessful here, it could have real-life implications to the lives and livelihoods of the farmers. I also want to focus on two other consequences that I think if you sustain Texas's motion, and that is it would discourage cooperation between the two states in administering the compact in that here, New Mexico attempted to do what this court has often indicated it would like states to do, and that is work with its neighbor. And yet, New Mexico would be unfairly punished for that. And second, we think that ruling against New Mexico and in favor of Texas would have the effect of elevating more of these issues to the court because it would deprive the river master of the ability to be resolving these issues as part of his duties under the amended decree. Thank you. Counsel, do you want to take a minute to wrap up? Thank you, Mr. Chief Justice. Under paragraph C5 of the River Master Manual, the master is tasked with charging Texas with evaporation when the water is stored, quote, at the request of Texas. There is no dispute that Texas requested that the stormwater be stored for its benefit. And there is no dispute that New Mexico conditioned its consent on the agreement that all of the evaporation would be charged to Texas. Nor is there any purchase to Texas' argument that the credit to New Mexico was untimely. Both states knew from the time of the flood that a retroactive adjustment to the accounting would be made. With the agreement of the states, the river master alerted the court to the unresolved issue and established a procedure for resolving it. New Mexico was justified in following the procedure identified by the river master. Granting New Mexico a credit for the Texas water is both consistent with the plain language of the compact and the River Master Manual and the equitable outcome. Thank you. Thank you, counsel. Ms. Hansford. Mr. Chief Justice, and may it please the court. Texas has not identified any error in the River Master's determination. First, the River Master was correct to apply C-5 of the manual, which addresses water stored in New Mexico at the request of Texas because Texas made an express request for storage. Second, there was no procedural obstacle. The 2014 Water Year Report specifically left open the relevant accounting and stated that the River Master would resolve the issue on a motion by a single state. Texas did not object. The determination reaches a result that is both technically accurate and entirely fair. The River Master found that but for Texas's request, New Mexico would have delivered the water before the evaporation occurred, meaning that it would have gotten credit for the full pre-evaporation amount. Ms. Hansford, I know that you don't think that Article 12 of the compact applies, unlike New Mexico, but what would the position of the government be under Article 12? Assuming it did apply as New Mexico argues. Assuming that this is a consumptive use by the United States, which is the part where we agree with Texas, we don't believe it is, but assuming this is a consumptive use for the United States, we do think that the provided clause of Article 12 is triggered because the water was stored for use by Texas, even though Texas ultimately didn't end up using as much water as it expected and had to waste other water to make use for it. But then what the party that receives it ultimately does does not address the question whether it was stored for use. So we do think the second clause would apply if you found that the article applies. And what do you think of the argument by Texas that the Rivermaster erred in adding the provision to the manual without the consent of both states? We don't believe that that is at issue here because that's not the procedure on which the Rivermaster relied to make this adjustment. To make this adjustment, the Rivermaster relied on the procedure he set out in the 2014 Water Year Report, which was suggested by the parties to which Texas did not object. And if Texas had objected, New Mexico could have taken steps to protect its rights, like seeking an extension from this court or moving for a manual provision that's prospective, which it could have done on motion at that time. What was the authority of the Reclamation Bureau to hold, to store the water at Brantley for Texas in the absence of a Warren Act contract? The authority was, in fact, the Flood Control Authority. But I'd like to clarify, because the Flood Control Authority, we do think is entirely consistent with the Rivermaster's findings in this case. Texas treats it as an on-off switch that either must be exercised or can't be exercised. But Reclamation has a lot of discretion and the record reflects that it takes the views of the stakeholders very seriously. And it's just a sort of minority. Thank you, Counsel. Justice Thomas? Briefly, Counsel, I'm a bit confused as to which approach to take. Texas says that Texas allocation refers to what it should have gotten under the 1947 conditions. You seem to suggest that it's what would have crossed state line. Could you give us the basis or give me the best argument for choosing one over the other approach? Yes, Justice Thomas. I think that Texas's position  because it sets the Article III obligation as both a floor and a ceiling. An amended decree makes clear that New Mexico is entitled to a credit for any overage. And so all the calculations the Rivermaster does determines the full amount. And the procedures do not change in years where New Mexico is going to fall short or fall over. The point is that New Mexico would have gotten a credit for the full amount if it had been delivered earlier, as it did, I would note, for the 30,000 feet of water that didn't evaporate. And so that shows that everything counts, not just up until New Mexico hits that bare minimum it's required to deliver in a particular year. Thank you. Justice Breyer. Well, I just want to be sure I got your argument. Is this one argument? Look, look at 6C5 and it says, go use the engineering report if you want to measure water, which could be measured by the inflow outflow method. OK, so now we look at the engineering report. The engineering report says when a Texas allocation is stored in New Mexico, any of the losses after that called channel losses are charged up to Texas. Now, is that how you're interpreting this or not? A couple of amendments to that, Justice Breyer. First, I think this is the manual, not the engineering report. But under the manual, we think that the piece that matters isn't the channel losses, but the phrase that says this quantity will be reduced when a quantity of the Texas allocation is stored and facilitated. Well, reservoir losses, I think. I see, reservoir losses. Will be reduced by the amount of reservoir losses, exactly. All right. I think mostly by Kavanaugh. And what do you think of what their view is on what I just said and what apparently you came close enough. I'm close enough to you. I want to give you a chance to answer their argument. We think that C-5 plainly applies by its terms. Page 61 of the appendix is a formal request from one commissioner to the other saying it is my request that New Mexico store Texas's portion of the flows. And so this is squarely within C-5 and the river master treated it accordingly. I think it's a really straightforward application of C-5. And I would note that now Texas for the first time is raising questions about the derivation of C-5. But C-5 was incorporated and of course amended decree as an integral part of the decree. It was in the manual, the original manual that the court adopted at that time. And so it seems a little late to be doubting the river master's power to apply that provision. Thank you. Thank you, counsel. Justice Alito, at a certain point, did the Bureau of Land Reclamation hold this water at Brantley for other than flood control purposes? Justice Alito, it was always under the flood control authority, but the reason for the flood control authority changed over time. In the first weeks after the storm, there were urgent public safety concerns and there really wasn't any question reclamation with exercises flood control authority. But subsequently, as Texas' request makes and New Mexico's response to it makes clear, things shifted somewhat. And there are exchanges between reclamation and Texas that indicate that reclamation understood that it was really Texas' concern that was driving it. There continues to be flood control. Your answer seems to be yes. The flood control justification ended and reclamation continued to hold the water because Texas had requested it. Is that right? No, Justice Alito, the flood control authority did not end because Red Bluff was full. So in that sense, it would cause a flood. But the natural solution to that was for Texas to make room in Red Bluff. And it was pushing back on that as it indicates in its own filing at page 80. Red Bluff was asking reclamation to hold as long as possible the water to give it the best chance to use. Perhaps my grasp of this case is simplistic. But it does seem to me that the water must either be held for flood control purposes or for some other purpose. And for the period when it was being held by the Bureau of Reclamation for flood control purposes, it cannot have been held at Texas' request, which would have required a contract, which didn't exist. Justice Alito, we disagree it's either or. But even if you think that's the case, we think there's some inherent wind down authority once reclamation has slowed down the water. And it really has to work out with the parties. It's hard to know how it would force Texas to empty the water. But it has to have some amount of discretion to release that water. And the parties of New Mexico was concurring in Texas' request. New Reclamation was trying to accommodate everybody's interest to the extent it could until it felt it really no longer could. It became clear Texas wasn't willing to enter a Warren Act contract under which it would pay for the storage. And then Reclamation felt like Texas ever did Texas ever suggest it wanted a Warren Act contract? Yes or no. My time has expired. Can you just answer that yes or no? No, thank you. Justice Sotomayor. Counsel, I know you don't think Article 12 applies because you didn't use the water. But I have looked at the glossary from the Bureau of Reclamation and it says any use which lessens the amount of water available for another use. So, for example, irrigation is a consumptive use because it depletes the available water supply. But it does it through absorption and even evaporation as well. And there you would say it was consumptive use. So if I assuming I disagreed with you, what would that do with respect to our decision making? Can we use Article 12 to explain the river master's decision, even though he didn't apply that provision? Or do we have only the power to review the river master's findings? Justice Sotomayor, let me take those questions in order. First, our argument on why this isn't a consumptive use by the United States isn't that evaporation isn't a consumptive use. It's that the United States didn't have an appropriated water right in this water. It only had an appropriated water right for the water below 42,000 feet. And we don't think a consumptive use includes evaporation. That is not incident to an appropriated water right. You don't think you're right. You don't think your right to control flooding is a consumptive use? No, because under that authority, reclamation simply slows down the water. It doesn't change the ownership or or other aspects of the water. But as to your second question, if you disagree with us on that, you can resolve this under Article 12. You certainly have the power to do that. We would just submit that because the river master specifically relied on T5 and because the application of T5 is so straightforward in this context, that would be the better way to resolve it, even if you disagree with us about the application of Article 12. Thank you. Justice Kagan? Ms. Hansford, what in Article 12 requires that the United States have an appropriated water right in order for this provision to apply? That's how we interpret consumptive use by the United States, Justice Kagan. But I'm asking why? Why is that language suggests an appropriated water right? Because the U.S. is holding the water and it's evaporating and evaporation is a consumptive use. Sir, because it wasn't incident to any consumptive use by the United States. The United States only had a right to consumptively use the first 42,000 acre feet. And so because this was just incident to slowing it down, we think it's more accurately described as a reservoir loss, which the compact uses elsewhere. We think that's the more appropriate term in this circumstance. OK, if I could go back to Justice Alito's questions. When you said initially the Bureau thought that there was there were flood problems, but then those concerns dissipated. And and and Texas's desire for the Bureau to hang on to the water started driving the Bureau's decision making. But isn't is that did that have anything to do with with flood control? The reason it still continued to relate to flood control is because there would be a flood until Texas released water from Red Block. So really, the discussion was over how hard to push Texas to take a step that would avoid the flood concern. And that's why I say this was kind of in a discretionary gray area. If New Mexico were resisting or if Texas weren't making this request, the analysis may have come out differently. And, you know, we think the record supports the Rivermaster's finding that it would have come out differently. But we do think there was a flood concern purpose. It's just that there were other options and it was Texas that was driving it. And I think that it really wouldn't make sense for Texas to make the request that it did if it was irrelevant to the Reclamation Flood Control Authority. So I think that that offers a lot of support for this interpretation. Thank you, Ms. Hester. Justice Gorsuch? Counsel, I'd appreciate your thoughts on the timing of this question, whether Texas is correct, that we lack jurisdiction to entertain this argument at all from New Mexico. Justice Gorsuch, we very much disagree there's a jurisdictional problem here. Normally, you would think of a jurisdictional time limit coming from a statute because Congress has the ability to limit lower court's jurisdiction. Here, there's no statute. And in fact, Article III sets out this court's jurisdiction. So we think the concept of a jurisdictional time limit really doesn't make sense in this context. But even if you think it does, this is worded like a classic claims processing rule, limiting a claimant's time to take a certain action and not at all in terms of the court's power or even willingness to exercise jurisdiction. Do you believe Texas waived or forfeited any complaint about timeliness given its conduct in this case? We believe that Texas forfeited any argument that the 2014 process set out by the Rivermasters somehow improper. And we don't take a position on equitable estoppel or judicial estoppel if you disagree with us on that part. But we do think Texas' course of conduct is indicative of the party's interpretation of the compact and amended decree to allow this type of procedure, at least when agreed by the parties, kind of as a fairly included in the Rivermasters' authority to issue an accurate final report. Thank you. Justice Kavanaugh. Thank you, Mr. Chief Justice. Good morning, Ms. Hansford. Earlier in the argument, the Chief Justice asked a question about the clearly erroneous standard, and I wanted to give you an opportunity to provide any thoughts you had on that. Obviously, it was in the 1988 amended decree, but any further thoughts you have about the appropriateness of that standard? That's right, Justice Kavanaugh. At the outset, I would note that it hasn't been challenged here and it was reflected in the court's earlier judgment. We think that it is probably appropriate because the parties did not object to it after the special master proposed it. So this is analogous to a consent. I would say it's analogous to Rule 63, where a special master is allowed to have a clear error standard of review just for factual determination when the party consents to it. And so we think that's appropriate here for the factual determination, but we don't think anything turns on the standard of review. We think the Rivermasters correct under any standard and that because he was close to the parties and all the representations that went on, as well as the technical issues, his views on the facts should get a lot of persuasive weight, even if you don't want to think of it as a clear error standard. Do you think of the primary dispute here as factual? I think the application of C-5 is straightforward and I don't think Texas has put a dent in it. So I do think the primary dispute is factual. Thank you. A minute to wrap up, Ms. Hansford. Thank you. As the discussion today indicates, the Rivermaster determination is the correct result under a straightforward application of the manual language. Texas's approach, by contrast, would saddle New Mexico with the full evaporative loss for water that would have evaporated on the Texas side of the state line. The Rivermaster determination was not erroneous and we would ask this court to deny the motion for review. Thank you, counsel. General Hawkins, three minutes for rebuttal. Thank you, Mr. Chief Justice. The arguments on the other side confirm that the best approach here is to do what this court said in 1983 and follow the compact and disallow anything inconsistent with it. I didn't hear Mr. Wexler tie C-5 back to anything in the compact and neither did the Rivermaster. Indeed, the Rivermaster admitted, and this is on page 286A of the Texas appendix, that he wasn't following the compact, that he was doing equity to New Mexico and he was using C-5 as a free-floating provision to do what he subjectively thinks is fair. The United States also doesn't tie this back to the compact except to invoke Article 3 and the 1947 condition, but that misunderstands Article 3. Article 3 has always applied inflow-outflow to figure out the 1947 condition, and you don't have to take my word for it. That's what this court said in 1983. Inflow-outflow underpins the compact and the court cannot depart from that in the name of convenience. I didn't hear my friends on the other side acknowledge A-2 of the manual at all. A-2 of the manual says that C-5 is a departure from inflow-outflow and explicitly ties it back to the compact. The United States thinks that C-5 is some free-floating equitable adjustment that can be deployed independent of the compact and that's contrary to A-2 and the 1983 decision. My friends on the other side accused us of writing C-5 out of the manual and I just want to underscore that is not true. We think that C-5 fully applies when we're dealing with unappropriated floodwaters or with the situation that Article 12 contemplates, but since neither one's implicated here, we can't look to C-5. One final point, Mr. Wexler suggested that ruling for Texas will open the door to more of these motions. The opposite is true. The best way to keep this case out of this court is to reaffirm that the compact controls and apply it strictly and deny the river master free-floating equitable powers and the history backs me up on that. During the 1980s, there was a special master in this case rather than a river master and under that special master, this case reached this court something like a half dozen times in the 1980s alone, but in 1987, the court eliminated the special master and appointed the river master and imbued him with very limited technical powers to perform technical calculations and nothing more. And since that time, things have gone great. This compact has been relatively amicable and litigation free up until now when the river master stepped away from the compact to apply his subjective sense of equity instead of what Congress determined. That was clear error and the motion should be granted unless the court has further questions. Thank you, General Hawkins. The case is submitted.